UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHERYL SIMMS JONES,<br><br>Plaintiff,<br><br>v.<br><br>THE BOEING COMPANY,<br><br>Defendant. | Case No. C25-5658-MLP<br><br>ORDER |

This matter is before the Court on Defendant The Boeing Company's Motion for Summary Judgment. (Mot. (dkt. # 23).) Defendant seeks dismissal of all claims in this action alleging employment discrimination and wrongful termination. Plaintiff Cheryl Simms Jones filed a response, in which she did not oppose dismissal of her claims of retaliation under the Washington Law Against Discrimination ("WLAD") and wrongful discharge in violation of public policy. (Resp. (dkt. # 28).) The sole remaining claim, therefore, alleges discrimination in violation of the WLAD, RCW 49.60.210. Defendant filed a reply. (Reply (dkt. # 30).) Having considered the parties' submissions, the governing law, and the balance of the record, the Court GRANTS Defendant's Motion for Summary Judgment (dkt. # 23).[1]

[1] The parties consented to proceed before the undersigned Magistrate Judge. (Dkt. # 8.)

## I. BACKGROUND

Ms. Simms Jones identifies herself as an African American woman over the age of 60. (Compl. (dkt. # 1-1), ¶ 1.1.) She began working at Boeing in 1987. ("Simms Jones Dep." (Green Decl. (dkt. # 29), ¶ 3, Ex. A (dkt. # 29-1); First Crowner Decl. (dkt. # 24), ¶ 2, Ex. A (dkt. # 24-1)) at 11:25-12:2.) Beginning before 2022, she was a Tooling Quality Manager at Boeing's Frederickson facility in Puyallup, Washington. (*Id.* at 20:10-15, 23:10-13.) Between January and April 2022, Ms. Simms Jones was on a special assignment, working from home, and then returned to Frederickson. (*Id.* at 50:17-21, 51:16-18.) In February 2022, she was awarded a merit-based pay increase. (Green Decl., ¶ 4, Ex. B.)

In building 24-50 of the Frederickson facility, Ms. Simms Jones had a desk located at the back wall of a chain-link enclosure referred to as the "cage" or "tooling cubicle." (Simms Jones Dep. at 36:19-37:2; "Aranyos Dep." (Green Decl., ¶ 5, Ex. C (dkt. # 29-3); Crowner Decl., ¶ 5, Ex. E (dkt. # 24-4)) at 15:5-7; "Harper Dep." (Green Decl., ¶ 7, Ex. E (dkt. # 29-5); First Crowner Decl., ¶ 6, Ex. E (dkt. # 24-5)) at 8:8-18.) The cage had one entrance, on the opposite side from Ms. Simms Jones' desk and about 30 feet away from her. (Harper Dep. at 43:18-44:6.)

In building 24-50, cranes would sometimes transfer heavy loads, a process referred to as a "crane move," which took around 30 to 40 minutes. (Harper Dep. at 24:6-23.) A crane move involves two stages: first the crane moves the load to a shipping container, then the "horse collar" attaching the load to the crane is detached from the load and the crane moves the horse collar back to its storage location. (*Id.* at 21:19-22:6.)

During a crane move, the area directly under the crane's suspended load is called the "load shadow." The load shadow, plus an additional area around it, is designated the "crane envelope" that people must stay out of for safety reasons. Ms. Simms Jones testified at a

deposition that, prior to her special assignment, her desk was outside the designated crane envelope for crane moves. (Simms Jones Dep. at 49:24-50:5.) In fact, people at the front of the cage—which was inside the envelope—would move to the area around her desk during crane moves in order to stay out of the envelope. (*Id.* at 50:8-12.) When she returned to Frederickson, a coworker told her that the entire cage was now within the crane envelope, but she never received official notice. (*Id.* at 52:3-23.) The coworker also told her to "be careful" because crane team members were "trying to get people in trouble." (*Id.* at 53:4-12.) During crane moves, workers would now need to move outside or stand by the exit door. (*Id.* at 54:11-17.)

Ms. Simms Jones testified that there was no clear, consistent notification process prior to crane moves. (Simms Jones Dep. at 269:21-25.) Sometimes the crane team would place a light near the cage and sometimes they would not. (*Id.* at 270:3-5.) They would not inform Ms. Simms Jones' team when they were done, so workers had to walk back into the building to see if the crane move was over. (*Id.* at 270:5-7.)

Kyler Aranyos, a crane operator, testified at a deposition to an informal approach to notifying employees that crane moves were starting or had ended. He stated that some members of Ms. Simms Jones' team had asked for a "five-minute heads-up" before crane moves, which he provided if he were doing the crane move. (Aranyos Dep. at 64:5:8.) Other crane team members would not give the heads-up, however. (*Id.* at 65:5-7.)

Mr. Aranyos testified that no single crane team member was responsible for making sure employees were notified to leave the crane envelope. (Aranyos Dep. at 8:16-24.) When the move was complete, "employees would look at us and, 'Hey, are we good?' And we'd give them a thumbs up or, 'Yeah, you're good.'" (*Id.* at 19:6-17.) He testified that employees would

"understand when the lights are off and we're putting everything away, the coast is clear. If you didn't understand that, you would ask. We would let you know." (*Id.* at 21:7-10.)

On July 7, 2022, Ms. Simms Jones wrote an email to a senior manager stating she had "had enough of these crane moves shutting us down for long periods of time." (Englund Decl. (dkt. # 26), ¶ 2, Ex. A (dkt. # 26-1) at 4.) She noted "at least 1.5 – 1.75 hours" over two days of unproductive time when her team of seven people could not work due to crane moves. (*Id.*, Ex. A at 3-4.) She acknowledged that "we need to move" but, because her team did not know when crane moves would occur, "this needs to be coordinated better than it is being done now." (*Id.*, Ex. A at 4.)

**A. The July 13, 2022 Incident**

During a crane move on July 13, 2022, Ms. Simms Jones was reported to be within the crane envelope. Crane operator Robert Harper testified in a deposition that, before the crane move, a strobe light on a tripod had been placed in front of the entrance to the cage. (Harper Dep. at 19:14-18.) He also testified that when doing a crane move he presses a button to sound the crane's horn "[p]robably about every five seconds." (*Id.* at 44:7-21.)

Ms. Simms Jones testified that she had headphones on and was in a meeting and had not been told a crane move was about to happen. (Simms Jones Dep. at 83:19-25.) Mr. Harper testified that in preparation for the crane move, when he looked through the cage area he saw Ms. Simms Jones at her desk, and told her she had to leave. (Harper Dep. at 18:20-19:3.) She said she was in a meeting, but he reiterated that she had to leave because "[c]rane moves have priority" and she then left. (*Id.* at 20:12-21:10.)

After the crane envelope was cleared, Ms. Simms Jones testified that she and other workers were outside for "so long [that she] was starting to get a little anxious," so she looked

inside "and it looked like they were done." (Simms Jones Dep. at 133:6-13.) She asked a crane team member, Adrienne Ferguson, if the crane move was done and Ms. Ferguson replied, "Yeah, I think so." (*Id.* at 133:14-15.) Ms. Simms Jones asked if she was sure, and Ms. Ferguson replied, "Yes." (*Id.* at 133:19-20.) Ms. Simms Jones then went back to her desk. (*Id.* at 143:11-12.)

Mr. Harper testified that, while the horse collar was being moved back to storage, crane team members shouted that someone was back in the cage. (Harper Dep. at 28:7-29:2.) Sometime during the move he passed over the "edge" of the cage with the horse collar. (*Id.* at 31:18-25.) The physical limitations of the crane apparatus prevent a load from passing directly over Ms. Simms Jones' desk, however. (*Id.* at 33:3-7.)

Because of the July 13, 2022 incident, Boeing installed lights and horns "where [the crane crew would] turn on a switch and a loud horn would sound and that would let you know a crane move is coming through." (Aranyos Dep. at 21:20-22:17, 25:4-6.) The light and horn would be turned off after the crane move was over. (*Id.* at 25:14-17.)

**B. Boeing Investigation**

Boeing conducted an investigation into the July 13, 2022 incident. Defendant's Rule 30(b)(6) representative, Breyan Paske, testified in a deposition that Boeing's High Hazard Determination document governed an investigation into whether an employee violated one of the High Hazard Program Requirements. ("Paske Dep." (Green Decl., ¶ 9, Ex. G (dkt. # 29-7); Second Crowner Decl. (dkt. # 31), ¶ 2, Ex. A) at 34:4-16, Ex. 3 (dkt. # 29-7 at 36-48).) Relevant here, a corporate investigator either determines or asks an Environmental and Health Services ("EHS") High Hazard expert to determine whether a High Hazard or Inviolable Rule violation occurred. (*Id.* at 34:17-35:11.) The High Hazard criteria involve four questions: (1) Was this incident within a High Hazard process category? (2) Was there a safety policy violation? (3) Was

there exposure to a hazard that would result in an injury that is likely to cause serious injury or fatality (High Hazard exposure)? (4) Was this incident an infraction of the Inviolable Rules? (*Id.*, Ex. 3 at 8-9.) In the category of Crane Operations, the Inviolable Rules for non-crane team members are: “I follow instructions to stay out of the crane envelope” and “I never walk under a suspended load[.]” (*Id.* at 9.)

Senior Corporate Investigator Jason Irwin led the investigation of the July 13, 2022 incident and engaged EHS High Hazard expert Frederick Lomasney to assess the four High Hazard criteria. On September 9, 2022, Mr. Irwin emailed Mr. Lomasney that “we will be determining that it’s more likely than not that [Ms. Simms Jones] re-entered the crane envelope during a crane move. We are requesting a High Hazard / [Inviolable] rules review and determination.” (“Irwin Dep.” (Green Decl., ¶ 10, Ex. H (dkt. # 29-8), Ex. 5 (dkt. # 29-8 at 22).)

On September 21, 2022, Mr. Lomasney responded with the results of his determination. He concluded that the July 13, 2022 incident (1) was within a High Hazard category, (2) was a safety policy violation, (3) did not involve exposure to a High Hazard because Ms. Simms Jones was not at risk of being under a suspended load, and (4) was not a violation of an Inviolable Rule because Ms. Simms Jones left the area after being asked to leave the crane envelope. (Irwin Dep., Ex. 5 at 20-22.)

The next email in the thread indicates Mr. Irwin phoned Mr. Lomasney. Mr. Lomasney changed his conclusion to question (3) to “yes” because Ms. Simms Jones “may have been underneath a suspended load” but still did not find an Inviolable Rule violation at question (4). (Irwin Dep., Ex. 5 at 20.)

Mr. Irwin produced an investigative report dated October 3, 2022. (Irwin Dep., Ex. 1 (dkt. # 29-8 at 15-19).) He found substantiated the allegation that Ms. Simms Jones “was asked

multiple times to leave the crane envelope prior to a crane moved [sic]. Additionally, . . . prior to the crane move being completed [she] re-entered the crane envelope and was under the crane with a suspended load." (*Id.* at 15-16.) Mr. Irwin's report appended his exchange with Mr. Lomasney. (*Id.* at 20-23.)

Employee Corrective Action ("ECA") Program Manager Kelly Farrow testified in a Rule 30(b)(6) deposition that her office determines whether an ECA Review Board ("ECARB") will be convened in a particular case. ("Farrow Dep." (Green Decl., ¶ 11, Ex. I (dkt. # 29-9); First Crowner Decl., ¶ 4, Ex. C (dkt. # 24-3)) at 7:9-24, 12:5-24.) Ms. Paske testified that an ECARB is "[t]ypically" not convened if no Inviolable Rule violation is found at question (4). (Paske Dep. at 61:6-8.) In this case, the July 13, 2022 incident was "escalated" because "[Mr. Irwin] or his manager believed that number 4. should have been 'Yes[.]'" (*Id.* at 61:1-5.)

Ms. Farrow chaired the ECARB on October 20, 2022. (Farrow Dep. at 7:22-24.) At the beginning of the meeting she read a script she had written, stating that "We are hearing this case due to it being a violation of the Inviolable Rules and to determine if there are aggravating factors that would elevate the level of corrective action from time off work to discharge." (*Id.* at 32:7-33:5.) Ms. Farrow acknowledged at her deposition, however, that there had been no finding of an Inviolable Rules violation at that point. (*Id.* at 35:6-10.) After the statement was read, Mr. Irwin presented his report to the ECARB. (*Id.* at 35:25-36:11.)

The ECARB determined that Ms. Simms Jones had violated an Inviolable Rule by not listening to the crane crew because "she was requested to go out for the entirety of the move, and she went back in prior to the move being completed, and so she was in the crane envelope during the crane move." (Farrow Dep. at 25:17-26:24.) The basis for the decision was Mr. Irwin's report. (*Id.* at 27:9-28:19.)

A High Hazard safety violation usually results in time off from work. (Farrow Dep. at 22:5-22; *see also id.*, Ex. 5 (dkt. # 29-9 at 40).) The aggravating factors listed in the ECA manual for a High Hazard violation are "significant impact; behaviors indicating a deliberate violation of safety policy, procedure, process or instructions; and the Inviolable Rules[.]" (*Id.*, Ex. 5 (dkt. # 29-9 at 40).) It is a violation for any employee to fail to follow safety rules, and for management to exhibit "behaviors that are contrary to a safe culture/environment or failure to appropriately address/report violations[.]" (*Id.*) In Ms. Simms Jones' case, Ms. Farrow testified that the ECARB found aggravating factors of deliberate misconduct and an Inviolable Rule violation. (*Id.* at 30:1-16.) The ECARB also considered the mitigating factors of Ms. Simms Jones' "30 years of service and clean . . . corrective action record." (*Id.* at 50:9-15.) The meeting lasted about 30 minutes. (*Id.* at 37:24-25.)

On October 26, 2022, an Employee Corrective Action Memo was issued to Ms. Simms Jones. (Green Decl., ¶ 6, Ex. D.) Boeing discharged her because she "had a high hazard safety violation when [she] did not remain out of the crane envelope during a crane move." (*Id.*, Ex. D.) The memo did not mention an Inviolable Rules violation and indicated no prior corrective actions. (*Id.*)

In responses to interrogatories, Defendant stated that Michael Cheney, a "White . . . Male" over 55 years old was transferred into Ms. Simms Jones' role of Quality Manager of Tooling in November 2022. (Green Decl., ¶ 15, Ex. M (dkt. # 29-13 at 6-8).)

Boeing Senior Human Resources Director Eileen Sewell stated in a declaration that Boeing had terminated another employee, James Davidson, for "remaining in the crane envelope during a crane move." (Sewell Decl. (dkt. # 27), ¶¶ 1, 6.) Mr. Davidson was a "White male hourly employee who is 60 years old" and, because he was a union member, he challenged the

decision through his union grievance process "and was eventually reinstated with a lesser sanction of time off from work." (*Id.*, ¶ 6.)

## II. DISCUSSION

### A. Legal Standards

#### *1. Summary Judgment*

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the Court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, *id.* at 585-87, and "evaluate the facts in the light most favorable to" the nonmoving party. *Chuang v. Univ. of Calif. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).

Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. It is the nonmoving party's

responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

*2. WLAD Discrimination*

"It is an unfair practice for any employer . . . [t]o discharge any person . . . from employment because of age, sex, . . . [or] race[.]" RCW 49.60.180(2). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang*, 225 F.3d at 1124[2] (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

---

[2] "Because Title VII of the Civil Rights Act of 1964 was the model for RCW 49.60, courts turn to decisions interpreting the federal provision when analyzing a claim under the WLAD as persuasive authority." *Salas v. Indep. Elec. Contractors Inc.*, 2013 WL 1898249, at *5 (W.D. Wash. May 7, 2013) (citing *Xieng v. Peoples Nat. Bank of Wash.*, 120 Wn.2d 512, 518 (Wash. 1993)).

In assessing WLAD claims where direct evidence is unavailable, Washington courts use the evidentiary burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wn.2d 516, 526 (Wash. 2017). First, the plaintiff claiming discrimination holds the burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. A plaintiff establishes a prima facie case by showing that she was (1) within a statutorily protected class, (2) discharged by the defendant, (3) performing satisfactory work, and (4) replaced by someone outside of the protected group or other circumstances give rise to an inference of discrimination. *Mikkelsen*, 189 Wn.2d at 527-32.

Next, if the plaintiff establishes a prima facie case of discrimination, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. Lastly, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason for termination is merely pretext for discrimination. *Id.* at 804.

At the pretext stage, "the presumption of discrimination drops out of the picture"; however, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up). Where "the record contains *reasonable but competing* inferences of *both* discrimination *and* nondiscrimination, it is the jury's task to choose between such inferences." *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 186 (Wash. 2001), *abrogated on other grounds by Mikkelsen*, 189 Wn.2d 516 (emphasis in original; citation and internal quotation marks omitted). Thus, to overcome summary judgment, a plaintiff needs to show that a reasonable jury could find

that discrimination "was a 'substantial factor' in an employer's adverse employment decision." *Mackay v. Acorn Custom Cabinetry, Inc.,* 127 Wn.2d 302, 310 (Wash. 1995).

**C. Plaintiff's Prima Facie Case**

The first two elements are undisputed. (*See* Mot. at 14.) Defendant disputes the third element, arguing Plaintiff was not performing satisfactory work because she failed to follow safety protocol during the July 13, 2022 incident. (*Id.*) As Plaintiff contends, this improperly inserts issues from the legitimate reason and pretext stages of the *McDonnell* framework into the prima facie stage. (Resp. at 16.) Plaintiff offers evidence of a merit-based pay raise shortly before the July 13, 2022 incident. This is sufficient to meet her burden.

As to the fourth element, Defendant argues that Plaintiff has not shown that a similarly situated employee was treated more favorably. (Mot. at 2.) Under Washington law, however, replacement by an employee outside the protected class is adequate to meet this element. *See Mikkelson*, 189 Wn.2d at 527; *see also Lui v. DeJoy*, 129 F.4th 770, 777 (9th Cir. 2025) (On Title VII claim, plaintiff "can satisfy the fourth element of the prima facie case merely by showing that she was replaced by someone outside her protected class."). Here, Plaintiff's replacement was not African American and not female, but it appears he was within the protected class for age-related discrimination. Plaintiff has established a prima facie case for her race and sex discrimination claims, but not age discrimination. Accordingly, the claim for age discrimination is dismissed.

There is no dispute that Defendant has offered an adequate non-discriminatory reason for Plaintiff's discharge, namely committing a High Hazard safety violation. (*See* Resp. at 17.) Accordingly, the Court turns to the pretext analysis.

**D. Plaintiff's Pretext Showing**

To survive summary judgment at this stage, Plaintiff must "raise a genuine factual question whether, viewing the evidence in the light most favorable to [her, Defendant's] reasons are pretextual." *Chuang*, 225 F.3d at 1126. A plaintiff can prove pretext (1) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable; (2) directly, by showing that unlawful discrimination likely motivated the employer; or (3) by some combination of direct and indirect evidence. *Id.* at 1127. "To survive summary judgment, the employee needs only to present evidence sufficient to create a genuine issue of material fact whether discrimination was *a* substantial factor in an adverse employment action, not the only motivating factor." *Mikkelsen*, 189 Wn.2d at 534 (emphasis in original; citation and internal quotation marks omitted).

Combined with a prima facie case, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147 (emphasis in original). However, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148.

*1. Cat's Paw/Biased Subordinate Theory*

One avenue for meeting a plaintiff's burden at the pretext stage is the "cat's paw" or "biased subordinate" theory. Where an "allegedly independent adverse employment decision" is asserted to meet the employer's burden at step two of the *McDonnell Douglas* framework, a plaintiff may defeat summary judgment by showing that a "biased subordinate influenced or was

involved in the decision or decisionmaking process." *Lui*, 129 F.4th at 779 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007)).

Plaintiff contends that if Ms. Farrow, Mr. Irwin, or a crane crew member acted with discriminatory animus, it would be imputed to Defendant. (Resp. at 23.) Plaintiff does not point to any evidence of such animus, however. Citing her testimony and an email, Plaintiff argues she was "targeted by crane crew." (*Id.* at 16.) The cited testimony states that Timothy Bean "will tell you that I was set up and likely more." (Simms Jones Dep. at 180:8-25.) The cited email, dated November 2022, is from HR Generalist Chelsea Tatman, who wrote that she spoke with Mr. Bean, who had reported to Ms. Simms Jones. (Green Decl., ¶ 14, Ex. L (dkt. # 29-12).) Nothing in the email indicates that Mr. Bean reported discriminatory animus toward Plaintiff. He reportedly said he thought Plaintiff was caught up in a "gotcha moment" because unspecified people "just planned to catch a manager."[3] (*Id.*) None of Plaintiff's proffered evidence supports finding discriminatory animus based on race or gender, however. Plaintiff has not met her burden through the cat's paw theory.

2. *Indirect Evidence of Pretext*

Plaintiff contends Boeing's reason for terminating her was pretextual as shown by multiple departures from the High Hazard Determination process: (1) factual inaccuracies in Mr. Irwin's report and intervention into Mr. Lomasney's determination; (2) holding an ECARB even though no Inviolable Rule violation had been found; (3) misinformation presented to the ECARB; and (4) escalation of the penalty from time off work to discharge. (Resp. at 18-21.)

[3] Defendant requests the Court strike Ms. Tatman's email because it reports an out-of-court statement from Mr. Bean, offered for the truth of the matter asserted. (Reply at 12.) The Court denies the request as moot.

Defendant contends it followed its policies, arguing that (1) no policy prohibited Mr. Irwin from providing Mr. Lomasney with accurate additional facts regarding whether Ms. Simms Jones re-entered the crane envelope or was under a suspended load; (2) an Inviolable Rule violation was not required prior to holding an ECARB; (3) the ECARB accurately relied on evidence that Ms. Simms Jones reentered the crane envelope; and (4) the ECARB reasonably found aggravating factors of deliberate conduct and an Inviolable Rules violation. (Reply at 5-9.)

Viewing the evidence in the light most favorable to the nonmoving party, Plaintiff presents evidence that Mr. Irwin concluded that she was under a suspended load, which was untrue because the crane could not reach over her desk, although Plaintiff does not dispute the evidence showing she was inside the crane envelope before the crane move concluded. Mr. Irwin's error infected the later stages of the process, convincing Mr. Lomasney to change his initial determination that Plaintiff was not at risk of being under a suspended load and influencing the ECA to convene an ECARB and then find an Inviolable Rules violation.

Viewing the evidence in the light most favorable to the nonmoving party, Plaintiff has shown serious flaws in Defendant's safety procedures and the process through which she was terminated. Defendant emphasizes the serious potential consequences of being under a crane load if it should fall, yet in July 2022 it apparently had no formalized or consistent procedure and no accountability for notifying employees when a crane move would begin or end. The process of investigating a potential safety violation was vague and poorly executed. Mr. Irwin, whether through overzealousness or carelessly conflating the crane's load shadow and the crane envelope, appears to have pushed an inaccurate narrative that Ms. Simms Jones was under the load shadow. The ECARB accepted this narrative uncritically.

Despite these serious flaws in the process, Plaintiff has not shown that they were based on discriminatory animus or that Defendant's legitimate reason for termination was pretextual. Plaintiff's pretext arguments rely on showing that Defendant departed drastically from its High Hazard Determination process. Drawing all reasonable inferences in Plaintiff's favor, it is clear that people made errors—even serious ones—in the High Hazard Determination process. However, they did not depart from the process. Mr. Irwin was not prohibited from conveying information to Mr. Lomasney, even if he was wrong. Ms. Paske testified that an ECARB can be convened in the absence of an Inviolable Rule violation, although it is not typical. (Paske Decl. at 61:3-5 ("an ECARB can be held even if the answer to number 4. is 'No' to make an independent evaluation").) With conflicting evidence before it, the ECARB found deliberate conduct constituting an Inviolable Rules violation and thus an aggravating factor to escalate the penalty imposed. Plaintiff presents evidence that this was erroneous, because she did not return to the crane envelope until a crane team member told her it was safe to do so, but not evidence that the ECARB violated its policies.

That an investigation is poorly done does not mean it was discriminatory. *See, e.g.*, *Shokri v. Boeing Co.*, 311 F.Supp.3d 1204, 1221 (W.D. Wash. 2018) (Insufficient evidence of pretext where, "[a]t most, Plaintiff provides weak circumstantial evidence of oddities or errors."). Antidiscrimination laws "do not prohibit employment decisions based upon . . . erroneous evaluations, . . . or even unsound business practices." *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011) (quoting *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997)). Plaintiff here fails to show that errors in the High Hazard determination process so greatly undermined Defendant's proffered legitimate reason for terminating her that it was unworthy of credence.

Plaintiff next contends that her replacement by Mr. Cheney, and the continued employment of comparator Mr. Davidson, provide circumstantial evidence of discrimination. (Resp. at 21-22.) Depending on the circumstances, "the attributes of a successor employee may be relevant to the second or third steps under the *McDonnell Douglas* framework." *Mikkelsen*, 189 Wn.2d at 532. Here, however, Plaintiff has not shown any relevance, such as evidence that Mr. Cheney attained the position despite lesser qualifications or due to his race or gender.

Defendant argues that Mr. Davidson was initially discharged, the same penalty imposed on Ms. Simms Jones, and that he is not similarly situated because he was non-management and a union member. (Reply at 9.) The Court agrees. To show discrimination, a comparator must be "similarly situated . . . in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Generally, "union employees are not similarly situated to non-union employees in Title VII cases" as long is this is "not read as a blanket statement that applies without respect to the facts of a given case." *Sacramento Cnty. Retired Emps. Ass'n v. Cnty. of Sacramento*, 975 F. Supp. 2d 1150, 1168-69 (E.D. Cal. 2013). Under the facts of this case, Mr. Davidson's union membership severed the link of similarity between him and Plaintiff. Both were initially discharged: Defendant treated them similarly up to that point. But only Mr. Davidson had the option of appealing through his union, which he did successfully.

The Court concludes Plaintiff has not met her burden to show Defendant's reasons for termination were pretextual. Nevertheless, even if pretext were established, the Court finds Plaintiff's evidence as a whole insufficient to survive summary judgment. As the Supreme Court held in *Reeves*, a plaintiff's prima facie case combined with sufficient evidence to find that the employer's asserted justification is false is not always sufficient to prevent judgment as a matter of law for the employer. "Whether judgment as a matter of law is appropriate in any particular

case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case[.]" *Reeves*, 530 U.S. at 148-49.

The only evidence of discrimination in Plaintiff's initial prima facie case was replacement by a person outside her protected classes. She has presented evidence of errors in the review process, but no evidence suggesting the errors were based on discrimination or so greatly departed from established procedures that the reason for termination was unworthy of credence. And Plaintiff has not shown that similarly situated individuals were treated more favorably. No evidence in the record indicates that race or gender played any part in Mr. Cheney replacing Plaintiff, and Mr. Davidson was terminated for the same conduct, even though as a union member he had access to an appeals process that later reversed that outcome. Even "taken as a whole, Plaintiff's circumstantial evidence would not allow a reasonable jury to find that Defendant's otherwise legitimate business reasons were merely a pretext for intentional discrimination." *Shokri*, 311 F.Supp.3d at 1213. Where, as here, Plaintiff "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred[,]" summary judgment is appropriate. *Reeves*, 530 U.S. at 148.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (dkt. # 23). Plaintiff's claims and this action are dismissed with prejudice.

Dated this 17th day of September, 2026.

MICHELLE L. PETERSON
United States Magistrate Judge